**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**CLAIRE HARRISON**                                                    **PLAINTIFF**

**V.**                                              **CAUSE NO.: 3:08CV269-HTW-LRA**

**LMA NORTH AMERICA, INC.**                              **DEFENDANT**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER RESPONSE IN
<u>OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

COMES NOW the Plaintiff, Claire Harrison, by and through her counsel of record and submits this her Memorandum Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment as follows:

## <u>I. INTRODUCTION</u>

Plaintiff was terminated in October 2007. Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) on November 5, 2007. Plaintiff received a Notice of Right to Sue from the EEOC on January 25, 2008. On April 25, 2008 Plaintiff filed her Complaint in this cause alleging among other things that the Defendant LMA North America (LMA) violated Title VII of the Civil Rights Act of 1964; the Age Discrimination in Employment Act (ADEA) and Miss. Code Ann. § 79-1-9. Specifically, the Plaintiff, Claire Harrison (Harrison) asserted claims that she was sexually harassed by her superior Steve Block (Block). Harrison was discriminated by gender, age and was subjected to *quid pro quo* and hostile work environment while employed at LMA.  The evidence set forth below supports Plaintiffs claims regarding genuine issues of material fact.  Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

## II. FACTS

On February 21, 2005 Claire Harrison was hired by LMA North America as a Medical Sales Representative for the Houston territory. Plaintiff performed her duties successfully without complaint or reprimand and regularly received corporate stock options in LMA, N.V. for over two years. Plaintiff received performance evaluations which indicated she was doing an outstanding job. On June 24, 2005, Harrison was elevated to the supervisory position of Southern Division Sales Manager. Plaintiff's performance according to her employer was outstanding. During this time, Steven Block ("Block") was Harrison's superior. Block was the Chief Operating Officer ("COO") and thereafter President for LMA North America. Block as COO required all Division Sales Managers such as Plaintiff respond to his requests on a regular basis. Block, together with and under the approval and knowledge of LMA, acted to create and maintain a hostile work environment for the Plaintiff because of her gender and age by engaging in the following behavior: derogatory and discriminatory comments and unwanted touching, and by other such actions too numerous to list in their entirety, but are listed in the exhibits and deposition testimony attached to the Plaintiff's Response, and to which Defendant was put on notice through the activities listed here, which are sufficiently similar to the unlisted activities as to give notice as to all activities of a similar nature.  During Harrison's employment at LMA the company had a zero tolerance policy for any types of Title VII violations including equal employment, no Title VII harassment and no sexual harassment.

In early 2006, while Block was COO, he instituted a plan that made the work environment hostile toward women and older employees. Block indicated that he intended to fill all the management roles with young male employees. Block stated he wanted employees who were young and male to fill management. As a female employee over the age of forty (40),

Block's comments made Plaintiff feel apprehensive that she may lose her job. Block began to focus on purging employees who were not young and he made no attempt to hide the fact that he wanted to hire a specific type of employee that was limited to young males. Block made a direct move to fire or release anyone who was not young males because he was looking for the alpha dog employee and a fraternity environment. Exhibit "C" 38:14.

Block instituted a plan of "management by harassment" which included verbally abusing employees in front of others, using threats and demands, making meetings with subordinates intense and very awkward. He required his managers to attend yearly sales meetings where they were required to create, condone and participate in presentations, games and skits of a derogatory and sexual nature. In 2006, 2007 and 2009 (no 2008 video was produced so the incidents at that meeting are still suspect) the skits included men dressing as women, women doing sexually explicit things with men's private parts and participating in sexually styled games. The employees were required by Block to participate in a talent show that directly violated LMA's zero tolerance discrimination and harassment policy and procedure. The employees did not speak out or attempt to complain for fear of losing their jobs or suffering the wrath of Block's disfavor. Harrison complained to her superiors as early as 2006, but was met with deaf ears.

Block started purging the positions held by older female employees and dissenters of his ways. Block established an attitude of "it's my way or the highway" for his subordinates. Block wanted to get rid of Harrison because she did not want to stay out all night drinking with Block and could not keep up with his fraternity style. In the words of one co-employee, "the environment that he was trying to cultivate, she [Harrison] did not fit into… it was a younger party crowd, and Claire was a little older and more settled… Block was creating a fraternity atmosphere." Exhibit "A" Depo. Manning 99:20-110:18.

At the same time Block was creating his fraternity atmosphere he began making strange sexual advances toward Harrison to intimidate her and as a quid pro quo request. While at a sales conference in Mexico, January 3-6, 2006, Harrison was told by Block that he would like to "get to know her better." Block again stated to Harrison that he intended to "get to know her better" January 15, 2006. The comment was directed to Harrison as a request for some form of quid pro quo sex. Harrison from that time forward tried to avoid being alone with Block.

On December 1, 2006 Block was advanced from COO to President and Chief Executive Officer (CEO) of LMA. At this point the hostile environment increased in intensity and frequency. On or about January 19, 2007 Harrison was on her way to a meeting when Block approached and reminded her of his intent to "get to know her."

In March 2007 Harrison received a job evaluation indicating she was meeting or exceeding expectations and that her division had ranked highly (#3 out of 5) for United States divisions in 2006. In May 2007 Harrison received 300,000 stock option shares from Block as a reward for her work.

In early May 2007 Harrison was attending a managers meeting giving a presentation. Block began verbally assaulting her in front of a group of other managers. Harrison was demeaned and humiliated in front of the other managers by Block for using different vocabulary than he was when referring to sales figures.

Later in May 2007 in St. Louis Block gave Harrison a bonus award of stock for good performance. After the dinner meeting Block requested Harrison to come up to his room to celebrate her recent bonus. He said he wanted to let their emotions show in a quid pro quo related to her stock option gift from Block. Harrison declined the invitation upsetting Block.

Block grabbed Harrison's arm informing her she would regret the decision not to go upstairs with him.

Only one month later, in June 2007, Harrison received verbal notice that her division was performing poorly and action would be taken if performance did not improve. In July 2007 Harrison was placed on performance review. However, in the month of July 2007, Harrison's division was ranked highly above many other divisions for performance in capital equipment. Despite the high ranking in capital equipment, in August 2007, Harrison was told she was not performing well.

Then, on October 9, 2007, without any further discussion, Harrison received a termination letter at her home in Hinds County, Mississippi.  The letter indicated her work performance was inadequate and her last day of work would be three days later on October 12, 2007. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on November 5, 2007, and received the Notice of Right to Sue in January 2008.

The effect of the policies and practices pursued by the Defendant limited, classified, and discriminated against the Plaintiff in ways that deprived her of her employment opportunities, and adversely affected her status as an employee due to her gender and age. Defendant's actions and inactions created a hostile work environment as defined by the Courts construction of Title VII. As a direct proximate result of the harassment, discrimination and negligent acts of the Defendant, the Plaintiff was caused to be terminated by Defendant and was caused to suffer serious and permanent injuries to her person. The Plaintiff suffered multiple injuries, which including but not limited to, lost wages, physical and emotional pain, suffering and mental anguish, and other damages.

## III. ARGUMENT & AUTHORITIES

### A.  STANDARD OF REVIEW

The moving party must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).  Upon review "…[a]dmissions, and pleadings, answers to interrogatories, depositions, affidavits are viewed in light most favorable to nonmoving party, as he is given the benefit of every reasonable doubt." *Spartan Food Systems, Inc. v. American National Insurance Co.*, 582 So.2d 399, 402 (Miss. 1991), *see also*, *McFadden v. State*, 580 So.2d 1210, 1213 (Miss. 1991). "Summary Judgments, in whole or in part, should be granted with great caution." *Brown v. Credit Center, Inc.* 444 So.2d 358, 363 (Miss. 1984).

Simply filing a Motion for Summary Judgment does not entitle the movant to a favorable ruling.  "The [Court] does not try issues. Rather, it only determines whether there are issues to be tried." *Burkes v. Fred's Stores of Tennessee, Inc.*, 768 So.2d 325, 328 (Miss. 2000). Further, "Motions for Summary Judgment are to be viewed with a skeptical eye, and if a trial court should err, it is better to err on the side of denying the motion." *Id*. The Court will overrule a Summary Judgment Motion unless "**beyond any reasonable doubt** [the] Court believes that [the] non moving party would be unable to prove any facts which would support his claim." *McFadden* at 1213-1214; *See also*, *Byrd v. Roadway Express, Inc.,* 687 F.2d 85, 87 (5th Cir.1982). See also, "**Motion for summary judgment should be denied unless it is established beyond a reasonable doubt the plaintiff would be unable to prove any facts to support the issues presented in the complaint***." Branch v. State Farm Fire and Casualty Co.,* 759 So.2d 430, 433 (Miss.2000).  "**Issues of fact sufficient to require denial of a motion for summary judgment are present where one party swears to one version of the matter in issue and**

6

**another says the opposite.***" Titus v. Williams*, 844 So.2d 459, 464 (Miss. 2003). "If reasonable minds might differ on the resolution of any material fact or even the inferences arising from undisputed facts, summary judgment must be denied." *Anthony v. Petroleum Helicopters, Inc.,* 693 F.2d 495, 496 (5th Cir.1982).

### B. PLAINTIFF'S CLAIMS OF NEGLIGENT SUPERVISION AND NEGLIGENT RETENTION ARE SUPPORTED BY THE LAW

A claim for negligent supervision and negligent retention can be made where a company defendant had, or should have had, knowledge of some propensity on the part of an employee to commit harassment and/or misconduct and a plaintiff suffers injury as a result. *See*, *Hollins v. City of Jackson*, 145 F. Supp. 750, 761 (S.D. Miss. 2000). In this cause, Plaintiff has shown that LMA knew or should have known that Block was harassing Plaintiff and creating a work environment which violated the company policies and federal laws and discriminated against the Plaintiff. As a result of LMA's negligent supervision and negligent retention of Block, Harrison suffered damages including, but not limited to mental suffering and lost wages. During the time Block was harassing Harrison and discriminating against her Block had meetings with Gordon Crass who was the Vice President of Sales. Krass specifically addressed the problems to both Block and Ron Eck, head of Human Resources, on several occasions stating Block's actions were in violation of LMA's company policy.

Steve Block wanted to turn LMA into a "boys club" and wanted to rid the company of older employees and female employees such as the Plaintiff, Claire Harrison. Mark Manning, Gordon Krass, and Tom Koning testified that Block wanted LMA to be like a fraternity.

> Q. Well, you did say you saw him acting out a fraternity
>    atmosphere, is that correct?
> A. Right. And you know, the environment that he was trying to
>    cultivate, she (Claire Harrison) did not fit into.
> Exhibit "A" Depo. Manning 99:20-25

A. Well, it was a younger party crowd, and Claire was a little older and more settled.
Exhibit "A" Depo. Manning 100:5-6

A. Steve Block was building a fraternity. . . . I meant a group of younger guys who you can go out and worth with and go out and party with.
Exhibit "B" Depo. Krass 51:22-25

Steve like – Steve likes a fraternity-type environment.
Exhibit "C" Depo. Koning 38:14-15

If you were not in the club you would be harassed into leaving or fired under some pretext. "I don't think that I spoke out. I mean, I was either scared I would lose my job over it or didn't think that it was worth bringing up, because it probably wouldn't be changed or addressed in the first place." Exhibit "A" Depo. Manning 41:3-7.

Q. What did he do or what did you hear him say that indicated to you that he was either trying to remove older people or he was trying to figure out a way to purge out older employees?
A. Well, he'd – **he'd question the fact that, you know, do you have the right people on the team**. Do you have the right people – the right person in the territory.
Exhibit "C" Depo. Koning 24:3-10

A. We had a very tenured sales force, and, obviously, some of the goals were not always being met. So in result of that, we **started being more aggressive** on how we were working with the – all employees or the tenured sales force in getting them to – to a higher level of performance.
And as a result, some people left. Some people were asked to leave**. And in turn, in the majority of the cases, yes, they were replaced by younger people.**
Exhibit "C" Depo. Koning 25:4-12

Block wanted LMA to be all young men or men that at least acted like young men. "Steve like – Steve likes a fraternity-type environment." Exhibit "C" Depo. Koning 38:14-15. He facilitated an atmosphere of work hard and play hard and expected all employees to partake in this atmosphere. Exhibit "B" Depo. Krass 51:22-25; Exhibit "C" Depo. Koning 39:9-13. He used

8

fear tactics and persuasion to insure employees fell into line and those who did not were let go. Exhibit "B" Depo. Krass 34:23-24.

Specifically, Block singled out Claire Harrison in his harassment because she was old and female. Exhibit "B" Depo. Krass 16:1-6.  Krass, as Vice President of Sales, spoke to Block as COO and Ron Eck as head of Human Resources about his concerns that Blocks actions were in violation of LMA policy. LMA would have been aware of this harassing environment at LMA and toward Harrison created by Block.  Krass testified that he spoke to Ron Eck in Human Resources on at least two separate occasions about Block's comments and behavior to exclude Harrison because of her age and gender. Exhibit "B" Depo. Krass 18:3. Krass testified that he was concerned about the problem of Block moving in only young males and he consulted Ron Eck at Human Resources at least two times about it. The response from Ron Eck was that nothing was done, allowing the problem to continue. Exhibit "B" 211-19 Krass was also aware that Block had it out for Harrison and warned her of this. Exhibit "B" Depo. Krass 49:6-50:22. Block admitted his discrimination against Harrison's age, gender and class to Krass.

> A. I thought that potentially her job could be in jeopardy.
> Q. Because of her type?
> A. Because of the comments—overall comments made, yes.
> Q. And what were the overall comments made about Claire
>    Harrison by Steve Block?
> A. Again, that he didn't like her type and that we needed to get
>    young, energetic guys in the management roles.
>    Exhibit "B" Depo. Krass 50:5-14
>
> Q. So the focus of the conversation with him [Block] was "Let's
>    get rid of the old people and get young people"? That's what he
>    was – that's what you're saying he was saying. Correct?
> A. I believe that was the inference, yes.
> Q. Now did he ever say that he did not like… Claire Harrison?
> A. Yes.
>    Exhibit "B" Depo. Krass 15:8-15

Block spoke with Krass about bringing in young men to replace the older employees. These discriminatory conversations were private and just for upper management Exhibit "B" Depo. Krass 13:1-15. Block's comments about bringing in younger men was not meant to be disseminated through the ranks. Exhibit "B" Depo. Krass 13:2-7.

LMA was on notice of Block's action because Block was the Chief Operating Officer and Krass was Vice President of Sales. As the leaders of management LMA knew or should have known about Block's propensity to commit harassment and/or misconduct toward Claire Harrison.

LMA claims workers compensation is the exclusive remedy for an employee who is injured by negligent supervision and negligent retention. This argument is incorrect. The injuries sustained by the Plaintiff were due to civil rights violations under Title VII and the ADEA as well as under Miss. Code Ann. § 79-1-9 so the remedy would fall outside of workers compensation. The claims asserted as negligent supervision and/or retention are duplicative of the federal claims so the remedy would be found under Federal Law and Miss. Code Ann. § 79-1-9. *Cf. Campbell v. Jackson Business Forms Co.*, 841 F.Supp. 772, 774 (S.D. Miss. 1994). The arguments in this section are incorporated into the sections below.

## C.  PLAINTIFF'S CLAIMS ARE NOT TIME BARRED NOR ARE THEY BARRED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Defendant attempts to limit Harrison's claims to the time period of 180 days before the EEOC complaint was filed. Plaintiff was terminated by the Defendant on October 12, 2007. Upon her termination she filed a timely Complaint on November 5, 2007 with the EEOC as required by Title VII and ADEA. All discrete acts within 180 days of filing her EEOC Complaint are considered timely. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 101-102 (2002). This means that each discrete act asserted in the Complaint occurring between

April 2007 and November 2007 were timely filed as discrete acts of discrimination. However, there were multiple acts of discreet discrimination that would fall under the hostile work environment which are not subject to the 180 days limit. Plaintiff has multiple discrete acts alleged in her Complaint that were timely filed and which occurred from 2006 until her the date of her firing on October 12, 2007.

In addition to the distinct acts of harassment having to occur within the specified time Plaintiff must reasonably exhaust administrative remedies prior to filing her claim in Federal Court. The two jurisdictional prerequisites for filing suit are (1) that a charge is filed with EEOC and (2) that a statutory notice of right to sue is received from the EEOC. *See*, *Taylor v. Books-a-Million*, 296 F.3d 376, 378-79 (5th Cir. 1980). Plaintiff filed her charge with EEOC and received her Notice of Right to Sue on January 25, 2008. Clearly, Plaintiff has claims of distinct acts which are not barred for failure to exhaust administrative remedies. Defendant's Motion for Summary Judgment on this issue should be denied. There are genuine material issues of fact that the jury must consider regarding discrete acts which occurred within and without the 180 day period.

　　　1. Instances Occurring Within 180 Days Time Limit

Plaintiff was wrongfully terminated October 12, 2007. Exhibit "D" Depo. Harrison 195:12-17. The discrete act of termination was within the 180-day prescribed time period. Plaintiff was terminated prior to the end of her final quarter of 2007 because she was an older, woman, and she refused Block's sexual requests. Block did not want older employees or female employees. Block was "wanting a group of younger people, mostly guys on his sales team" and people like Claire Harrison did not fit into that profile. Exhibit "A" Depo. Manning 55:16-20.

　　　Q. Did you ever get the impression that the profile he was seeking
　　　　 for was a young white male profile?

> A. Well, yeah. From the one comment he made, you know.
>    Exhibit "C" Depo. Koning 23:14-18

> A. There were references made by Steve that specifically talked
>    about getting younger men into management roles."
>    Exhibit "B" Depo. Krass 11:13-15

Tom Koning heard Block make comments about getting "the young hungry, you know, guy into the territory." Exhibit "C" Depo. Koning 63:10-11.  Harrison is a white, female, over the age of 40. Because Harrison was not young or male Block sought to terminate her. "I knew Claire had a short tenure left with the company. It was only a matter of time." Exhibit "A" Depo. Manning 99:4-5. "The environment that he [Block] was trying to cultivate, she [Harrison] really did not fit into." Exhibit "A" Depo. Manning 99:23-25. Block told Krass that he was trying to replace Claire Harrison because she was not a young male. Exhibit "B" Depo. Krass 111-13:1. "He [Block] didn't like her type and [LMA] needed to get young, energetic guys in the management roles." Exhibit "B" Depo. Krass 50:12-14.  Harrison was told that Block only wanted "young white men" on his management team. Exhibit "D" Depo. Harrison 61:12-19.

In addition to terminating Harrison for being an older female, Block also made disparaging comments regarding her heritage.  Harrison heard Block comment to others that southerners are "slow and stupid." Exhibit "D" Depo. Harrison 42:17-24.  Harrison later addressed Block regarding this comment telling him that his remarks were inappropriate.

> We in the South don't feel that – we feel your remarks were
> embarrassing. We're not that way. Inappropriate – your remarks
> were inappropriate.
> Exhibit "D" Depo. Harrison 44: 1-4.

Block's response was "too bad". Exhibit "D" Depo. Harrison 44:4. Koning also remembers Block making "jokes about people from parts of the country…." Exhibit "C" Depo. Koning 48:13-14. Specifically, he remembers the jokes about southerners being "not as quick, not as

sharp." Exhibit "C" Depo. Koning 49:19. Manning heard that Block referred to southerners as slow. Exhibit "A" Depo. Manning 36:1-2. Block did not like Harrison because she was a southern older female, she refused his propositions for sex and did not fit in his fraternity atmosphere. So, he terminated her employment with LMA. Exhibit "D" Depo. Harrison 94:19-95:5. The discrete action of wrongful termination was within the prescribed statue of limitation.

In May, 2007 there were two discrete incidents of direct harassment against Harrison by Block. The first incident occurred in May 2007. Plaintiff was in San Diego at a meeting at where Block got in her face and cussed her. Exhibit "D" Depo. Harrison 337:19-339:11.

> A. – where he was upset in the managers meeting and just – he got
>    angry, irate, and started – every other word was the "F" word.
> Q. And who was he irate at?
> A. Me.
> Q. Okay. And who was in there when he was doing that?
> A. The managers.
>    Exhibit "D" Depo. Harrison 338:1-8

Mark Manning was at this managers meeting and testified about the incident as follows:

> [I]t was a managers' meeting when we were presenting out
> business plans, and **[Block] was singling Claire out** and isolating
> her on some of the numbers that she was presenting when – I
> remember my opinion of the situation there was that they were just
> calling the same number two different things. Like one person was
> calling a number "budget," and the other person was calling the
> number "forecast." And it was just this back and forth where Claire
> – he was making Claire look ignorant like she didn't understand
> her business when she was just using a different definition to
> explain her number.
> Exhibit "A" Depo. Manning 32:3-15

This is one discrete example where Block harassed Claire Harrison because she was an older woman who he wanted to remove from her position at LMA. See LMA employee regulations preventing unlawful harassment including inappropriate verbal and physical conduct. Exhibit

"K" Employee Handbook Excerpt p.6.  This discrete act occurred within the statutory 180-day time period.

The second May 2007 incident occurred in St. Louis. Harrison and Mark Manning were in St. Louis for a meeting with Block regarding their grant of company stock options as a reward for their hard work. Harrison testified how she refused to have a drink with Block and he physically confronted her about having sex with him:

> That it was after dinner, going back to the hotel where Steve Block asked me to have a drink with him. I said no, I was tired. **And he asked me to go up to his room, and I said no, and that's when he grabbed my arm and said, "Why don't you want to have sex with me? I am the CEO of a major corporation." And I said, "Would you take your arm off me?" The door opened, and I left.**
> Exhibit "D" Depo. Harrison 94:19-95:2

> Mark Manning called me when I got back to my room. He had to drive to his room some distance away, but he called me, and he said, "You're upset. What's wrong?" And I just said, "It'll be okay. Let's talk about these shadow share stock options." I changed the subject.
> Exhibit "D" Depo. Harrison 95:18-23

Manning verified that something upsetting occurred to Harrison when he left her and Block alone.

> So [Block] rolled out the plan to me and Claire individually, and I remember that night at dinner we were at a little barbecue place It was a casual dinner, but I was awkward having to have dinner with the two of them because of the – how hard and direct he was being towards Claire about, you know, getting the job done and riding her people. I remember afterwards when I dropped them off at their hotel and I went back to mine, that you know, she was pretty upset and pretty shaken.
> Exhibit "A" Depo. Manning 31:17-32:1

> I don't remember when I talked to her, but I know that she was upset enough to cry afterwards. Okay. And I think she – I remember her telling me that she was just so confused, because at one junction she felt like her job was on the line and she could just

be let go on the spot, but it seems like when they got back to the
hotel, she said he wanted to grab a drink at the bar. And I think I
remember her saying it was just a mixed message.
Exhibit "A" Depo. Manning 33:12-22

Manning, recalled one time when he was personally verbally assaulted/harassed by Block stating

that, "[Block] can make things very intense and very awkward." Exhibit "A" Depo. Manning

34:7-8.  This distinct act of harassment occurred within the 180-day statue of limitations.

2. <u>Instances of Hostile Work Environment and Harassment Outside of the 180 Time Limit</u>

Plaintiff's Complaint addresses discrete acts that occurred outside of the 180 day time

period. These acts are facts that prove the cumulative effect of Block's individual acts. Plaintiff

not only made claims of discrete acts, but also alleged LMA was a hostile work environment.

"Provided that an act contributing to the claim occurs within the filing period, the entire time

period of the hostile environment may be considered by a court for the purposed of determining

liability." *National Railroad Passengers Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

All the acts which occurred prior to the 180 days must be considered when addressing

Plaintiff's hostile work environment claim. All of these acts commence as far back as 2006. The

January 2006 and January 2007 National Sales meetings videos are great examples of the time

period of the hostile environment. The 2006 and 2007 videos of the meetings where the

managers, including Harrison were required to create and participate in skits that were off-color

and of a sexual nature violated LMA employ policy for both unlawful harassment under Title

VII and for sexual harassment.

a. **2006 Corporate Meeting Video**

The 2006 video of the corporate meeting shows skits like "Goldmember," where an LMA

employee wears the company product as his genitals. He unzips his pants and the LMA product

flops as if it were a penis and he then parades around on stage insinuating the quality of his

goldmember. Exhibit "D" 128:16-21. The 2006 video also shows the LMA male employees dressed like women, going into a male bathroom and using a male urinal. It also shows a male groping another male who is dressed up as a woman and aggressively fondling her breasts. The 2006 video also contains a skit about "Queer Eye for the Straight Guy," with derogatory comments towards homosexuals.

### b. **2007 Corporate Meeting Video**

The 2007 video shows the "D—ck in a Box" parody where employees get on stage with boxes strapped to their crotch areas and dancing in a sexually suggestive way to a sexual video song called D—ck in Box. Another skit involves employees on stage in a military type formation and drill routine which ends with each person pulling the other person's pants down to the floor. Another skit was a dance routine performed by Corporate Sales department in which the music and topic was "peoples bottoms", where participants had their bottoms heavily padded to accentuate the bottoms and they were slapping each others bottoms.

These videos show how pervasive and severe the hostility and harassment were and that they were encouraged and sanctioned by LMA. The sexual propositions for quip pro quo that occurred in January 2006 at Utah and at Cabo San Lucas by Block against Harrison while not within the 180 day time frame are again both instances that go to the history of Block establishing a hostile environment of intimidation and sexual harassment.

### c. **2009 Corporate Meeting Video**

This video was created after Harrison was fired. But, the video which is relevant, shows how LMA continued a policy and practice of ignoring its own rules on discrimination and harassment. The 2009 video and testimony about the 2009 sexual skits performed at the National Sales Meeting is used to show the continuing policy and practice by LMA of violating its own

policies and Title VII and ADEA. The information also is relevant to witness testimony regarding their understanding of LMA's harassment policies and implementation of those policies at LMA. Multiple witnesses testified they received LMA's harassment training, but they did not understand its implementation and did not feel that skits performed at the National Sales Meeting would violate Title VII or the company policy. This evidence is relevant to the claims made by Plaintiff and admissible under the Federal Rules of Evidence.

Defendant argues that documents drafted by LMA after Plaintiff was wrongfully terminated should be excluded from evidence. This is not true. Federal Rules of Evidence 402 states, "All relevant evidence is admissible…." Relevant evidence is defined by Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence regarding organizational changes and the management structure of LMA are relevant to the claims in this cause and admissible. Plaintiff does not intend to rely on the memorandum regarding organizational changes in 2008 referred to in Defendant's brief. The management structure is merely a diagram which Plaintiff may use demonstratively to show the hierarchy of job positions within the company. Many of the names of employees holding these positions have changed and the document would be redacted to reflect those changes if introduced at trial.

### D.  PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION ARE SUPPORTED BY THE LAW

To have a valid claim for gender discrimination Plaintiff must establish a prima facie case by showing the Plaintiff is (1) member of a protected class; (2) qualified for her position; (3) subject to adverse employment action; and (4) treated less favorably than a similarly situated

male employee. *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). Plaintiff meets these elements.

1. Member of Protected Class

There is no dispute that plaintiff is a female over the age of 40 and a member of a protected class.

2. Plaintiff is Qualified for Her Position

LMA claims for the first time in its brief Harrison was not qualified for the job they gave her and she held for over a year. Plaintiff graduated from Louisiana Tech with a Bachelor of Science in 1972. Exhibit "D" Depo. Harrison 179:19-22. Plaintiff has been working in the medical sales profession since 1981. Exhibit "D" Depo. Harrison 200:19-20. Krass testified that Claire Harrison was "an outstanding salesperson and had and excellent track record." Exhibit "B" Depo Krass 64:15-16. Tom Koning also testified that Harrison was qualified for her position, "I felt like Claire had the abilities, had – and definitely had the experience." Exhibit "C" Depo Koning 20:7-9. Harrison was competent and able to do the job. Exihibit "C" Koning 19:20-24. Ron Eck felt Harrison was qualified- "[I] could not find any reason why we shouldn't hire her." Exhibit "E" Depo. Eck 60:24-25. Despite being qualified for her position Claire Harrison received adverse employment action by being wrongfully terminated on October 12, 2007.

3. Plaintiff was Subject to Adverse Employment Action

There is no dispute that Harrison was terminated in October 2007.

4. Plaintiff was Treated Less Favorably than a Similarly Situated Male Employee

Harrison's termination was less favorable than a similarly situated male employ. Mike Couch, a male employee with the company was given Harrison's position after she was

terminated. When Couch was unable to perform, he was demoted back to his original position of sales representative when he was reprimanded for poor performance. Exhibit "D" Depo. Harrison 91:24-92:14. Harrison was not offered a demotion back to sales, but was summarily fired. Mike Couch, like Harrison, was a sales representative that was internally promoted to management. Exhibit "E" Depo. Eck 71:15-19. After working in the management position for a time he was removed from the position for "lack of performance." Exhibit "E" Depo. Eck 72:17-18. Rather than being terminated from employment at LMA, Couch was offered the opportunity to return to his original sales position with the company. Exhibit "E" Depo. Eck 73:8-15. There were open sales representative positions in the company when Harrison was terminated, but she was not offered a demotion to the sales position. Krass specifically told Harrison she was fired because she was old and female. Exhibit "D" 240:1-17.

Block maintains a discrimination range that covers gender, ethnicity and religion. Block made it a point to tell other managers he thought women were idiots. Exhibit "D" 64:17-20. He made derogatory comments about hiring African Americans to make quotas. Exhibit "D" 230:4-10. Block made comments about people from the south being slow and stupid. Exhibit "A" 36:1-4; Exhibit "D" 230:2. Block commented the south is slow and stupid because it if full of rednecks and blacks. Exhibit "D" 341:4-16. Block's comments indicate that he intended to treat Harrison less favorably because of her gender, age and most likely her regional influences.

5. <u>Plaintiff's Termination for Poor Performance is Pretext</u>

Defendant argues that Plaintiff was fired for poor performance. Poor performance was merely a pretext for Harrison's wrongful discharge. Evidence shows Harrison's discharge was due to the fact she was an older female.

> When I raised my issues with Gordon Krass, and he spoke -- and he told me this. He went to Steve Block, and Steve Block just said,

**"Tell her to get over it, that I don't like her because she's old. I don't like her because she's a woman."**
Exhibit "D" Depo. Harrison 288:20-25

Gordon relayed that to me, and Gordon said that "I have done what I could do." He also reported to Ron Eck, and he subsequently followed up with Ron Eck, and he said, "Claire, I've reported this, and no one will do anything, so the best thing for you to do is -- **you have a mark on your back -- is to be quiet, do your job, or you will be fired."**
Exhibit "D" Depo. Harrison 289:9-16

Block fired Harrison because he was "wanting a group of younger people, mostly guys on his sales team" and people like Claire Harrison did not fit into that profile. Exhibit "A" Depo. Manning 55:16-20.

Q. Did you ever get the impression that the profile he was seeking for was a young white male profile?
A. Well, yeah. From the one comment he made, you know.
Exhibit "C" Depo. Koning 23:14-18

A. There were references made by Steve that specifically talked about getting younger men into management roles."
Exhibit "B" Depo. Krass 11:13-15

Tom Koning heard Block at planning sessions say about getting "the young hungry, you know, guy into the territory." Exhibit "C" Depo. Koning 63:10-11. "I knew Claire had a short tenure left with the company. It was only a matter of time." Exhibit "A" Depo. Manning 99:4-5. "The environment that he was trying to cultivate, she really did not fit into." Exhibit "A" Depo. Manning 99:23-25. Block was trying to replace Mrs. Harrison with a younger male manager. Exhibit "B" Depo. Krass 11:18-24. Block's preference was for younger men. Exhibit "C" 18:10-21. Block was systematically getting rid of older people for young men. Exhibit "C" 19:1-6. The impression Koning got from Block's actions was Block was seeking to hire young white males. Exhibit "C" 23:14-17. Block likes the fraternity-type atmosphere. Exhibit "C" 38:14-16. "He [Block] didn't like her [Harrison's] type and [LMA] needed to get young, energetic guys in the

management roles." Exhibit "B" Depo. Krass 50:12-14. Harrison was told that Block only

wanted "young white men" on his management team. Exhibit "D" Depo. Harrison 61:12-19.

LMA claims Harrison was fired because she did not meet her quota numbers. Again,

there is mere pretext. Witnesses testified that if Block no longer wanted an employee working at

LMA he would pressure their discharge modifying their quotas and ranking them at the bottom

of his ranking scale to facilitate their firing.

> **A: Steve Block had his own evaluation system that – that**
> **weren't necessarily tied to performance or results**.
> Exhibit "B" Depo. Krass 38:8-9

> Q. Tell me about if Steve Block didn't like somebody, what would
> he do as far as how he would rank them?
> A. Well, they probably fall to the bottom of the ranking.
> **Q. Okay. So if he didn't – if he didn't like you personally, it**
> **would hurt your ranking. Is that correct?**
> **A. Yes, you could say that.**
> Exhibit "C" Depo. Koning 20:18-21:1

> Q. [I]f Steve Block doesn't like somebody personally or if he has a
> beef with them, would he let that personal information
> circumvent or overcome the quality of work that that person is
> providing?
> A. Possibly. I mean, he – back when I was there, I mean, he'd
> make it publicly known his – you know, his feelings about
> someone. It could be something off the cuff or other people
> know about. So, you know, could – could it directly impact that
> employee or, you know, influence other people in the
> organization with that employee, I – I – you know, I suppose
> that could be the case.
> Exhibit "C" Depo. Koning 21:24-22:10

> Q. Okay. Other things that were conveyed by Tom Koning?
> A. **That Steve Block had ways of getting rid of people that he**
> **didn't like, and that would be -- he kept a list of people that**
> **he wanted to get rid of and that their quotas could be**
> **manipulated in order to get rid of them, and managers of**
> **that person were told not to help them and not to work with**
> **them in order to speed their release –**
> Exhibit "D" Depo. Harrison 62:3-12

Block often used his intimidation to push out qualified employees because he just did not like

them.  Krass was forced to fire employee, John Loughery. Krass testified that the reason

Loughery was fired was for "performance, but I was – received significant pressure from Steve

Block to do that." Exhibit "B" Depo. Krass 71:21-23. Krass said if he had not received pressure

from Block he would not have fired Loughery. 72:10-13. Mark Manning testified he witnessed

the purging of older employees by Block, "It started with Sally Chase, then it was John

Loughery, then it was me, and then it was Claire Harrison." Exhibit "A" Depo. Manning 24:14-

16. This evidence supports Plaintiff's claims of gender discrimination. There are genuine issues

of material fact which a jury must determine. Krass sums up Block's actions best - Fraternity

environment, "I don't like Claire's [Harrison] type!", "I want young guys working here, filling

these management positions." Exhibit "B" 66:13-25. That should be enough testimony to raise a

question of fact under the preponderance of evidence standard.

### E.  PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT ARE SUPPORTED BY THE LAW

1. *Quid Pro Quo* Sexual Harassment

Plaintiff has submitted evidence to show *quid pro quo* harassment occurred.  *Quid pro*

*quo* occurs when an employee is harassed by a supervisor and has suffered a "tangible

employment action" as a result of their failure to accept the harassment.  Harrison was subject to

*quid pro quo* harassment. Plaintiff's Complaint expressly raises a quid pro quo harassment claim

in paragraphs 15-17, 21, 30-31 where the Complaint describes the request by Block for sex and

his expression that Harrison will regret not acquiescing to the request and her termination.

Exhibit "J." The specific term quid pro quo is not required to be stated in the Complaint.

*Burlington Industries, Inc. v. Ellerth,* 118 S.Ct. 2257, 2264 (1998).  Since plaintiff alleges she

22

was fired for not agreeing to her supervisors sexual advances and because she was a woman both claims for *quid pro quo* and hostile work environment apply.

In May 2007, Plaintiff was in St. Louis with Block and other LMA employees. After dinner Block asked Claire Harrison to have a drink with him. Exhibit "D" Depo. Harrison 94:19-20. Harrison declined, stating she was tired. Exhibit "D" Depo. Harrison 94:21.Then, Block asked her to go up to his room. Exhibit "D" Depo. Harrison 94:22. Plaintiff again declined. *Id*. Block then grabbed her arm and said, "Why don't you want to have sex with me? I am the CEO of a major corporation." Exhibit "D" Depo. Harrison 94:23-25. Harrison told Block to unhand her and exited the elevator at the next stop. Exhibit "D" Depo. Harrison 94:25-95:2. Manning, who also was in St. Louis, remembers calling Harrison and she was upset and shaken up. Exhibit "A" Depo. Manning 31:17-32:1Exhibit "A" Depo. Manning 33:12-22. After  Harrison refused Block's sexual advances in May 2007 she began receiving negative treatment and was fired from LMA. Exhibit "D" Depo. Harrison 95:2-5. Harrison had been in St. Louis to receive a stock option bonus, but after her refusal of Block's sexual request, she received a write up for poor performance and less than six months later was terminated. Her termination was a tangible employment action. These facts support Plaintiff's claim of quid pro quo sexual harassment.

### 2.   Hostile Work Environment Harassment

Plaintiff  has shown proof of hostile work environment harassment. To prove a case of hostile environment the claimant must show that the harassment is severe or pervasive. *Slay v. Glickman*, 137 F. Supp. 2d 743, 750 (S.D. Miss. 2001). On four separate occasions Block propositioned Harrison for sex. The first time was in January 2006 while at the National Sales meeting Block told Harrison that he intended to get to know her better. Exhibit "J" Complaint ¶ 13. Plaintiff understood that Block was asking for sex. *Id*. The second time was also in January

2006, while at another work function, Block requested that Harrison and he get to know one

another better. *Id*. After this second proposition, Harrison tried not to be alone with Block.

Despite her attempts to not be alone with Block she again was alone with him in January 2007.

Block again requested sexual favors. Exhibit "J" Complaint ¶ 15. In May 2007, Harrison was

alone with Block in an elevator when he propositioned her for a fourth time. Exhibit "J"

Complaint ¶ 17. Plaintiff declined his offer and Block grabbed her arm and threatened her

stating, she would regret not consenting to his requests. *Id*.

> Steve Block asked me to have a drink with him. I said no, I was
> tired. And he asked me to go up to his room, and I said no, and
> that's when he grabbed my arm and said, "Why don't you want to
> have sex with me? I am the CEO of a major corporation." And I
> said, "Would you take your arm off me?" The door opened, and I
> left.
> Exhibit "D" Depo. Harrison 94:19-95:2

 Krass testified that the rule at work was you were penalized and verbally abused by Block if you

turned down one of Block's dinner invitations. Exhibit "B" 39:8-24. Krass testified that he was

so concerned about being penalized for missing the dinner invitation from Block that "it bothered

me to the point where I made sure I didn't miss them." Exhibit "B" Depo. Krass 40:12-16.

Not only was there the pervasive sexual advances by Block, but also there was a general

environment at LMA which condoned sexual harassment and retaliation in violation of LMA

policy for equal employment, unlawful harassment, and sexual harassment under Title VII. An

example of the hostile work environment sexual harassment is the videos for the 2006 and 2007

National Sales meetings. The skits required each sales region to perform as a team building

exercise. These skits were overtly sexual, graphic in nature, left little to the imagination, and

were authorized and facilitated by management.

Q. Who authorized those skits?

A. Typically, anything for the sales meetings, you know, was
   approved by sales management and marketing and, ultimately,
   you know, approved by the – you know, Steve Block or
   Gordon Krass.
   Exhibit "C" Depo. Koning 34:9-13

Q. You're telling me that it is a team building thing to have to
   work on these sexual skits, correct?
A. Well, you know, it wasn't mandated that the skits be sexual in
   nature. It just wasn't filtered. I mean, if you really want to peal
   back all the layers of the onion, yeah, those were probably
   against company policy as it is, you know written and
   presented.
Q. So was the leadership condoning them?
   (Line 7 omitted)
A. Yeah. Absolutely.
   Exhibit "A" Depo. Manning 37:21-38:7

Q. Okay. Were you required by LMA to produce a skit?
A. Yes.
Q. Let me put it this way: What if you said, "From the southern
   division as the southern manager, I'm just not going to do a skit
   this year"? What would have occurred?
A. I probably would have been terminated.
   Exhibit "D" Depo. Harrison 356:11-18

The skits violate LMA policy regarding sexual harassment. LMA's policy on sexual harassment

clearly defines "jokes or gestures that have a sexual content or sexual connotation" as being an

example of sexual harassment. Krass admitted the skits violated sexual harassment, age

discrimination and gender discrimination or equal employment discrimination policy at LMA.

Exhibit "B" 47:6-14. See also, Exhibit "B" 43:23-44:16- Krass admits the 2006 video showing

use of the LMA tool as male penis and a man dressed as woman and another man squeezing her

breasts violates LMA sexual harassment policy. LMA Employee Jennifer Clark, was asked if she

believed the skits to be sexual in nature to which she responded, "I think a lot of times these skits

would play on different innuendos." Exhibit "E" Depo. Clark 21:3-11. Ms. Clark testified she

had heard jokes in LMA about the LMA breathing devices representing or looking like the

female genitalia. Exhibit "E" Depo. Clark 26:4-5. LMA employee Shawna Hamon testified the

LMA harassment policy was zero tolerance:

> LMA has a zero tolerance for sexual harassment in the workplace,
> whether that be from a verbal or written or even a pictorial sort of
> – even items that are maybe said as a joke, it's not appropriate to
> be offensive to others.
> Exhibit "G" Depo. Hamon 8:10-14

Plaintiff found many of the skits to be highly offensive and sexual in nature.

> One was the Goldmember, the -- and the same year, the one with
> Lauren Moose and Tom Flynn that had the sexual innuendos in it,
> and then the -- other would be the "D___ in the Box."
> Exhibit "D" Depo. Harrison 166:16-20

The skits were spoofs from other programs such as Goldmember which was based on a movie

and "D--ck in a Box" from a Saturday Night Live sketch. In these skits management approved

that the LMA breathing tube be used to represent male genitalia. The LMA breathing device was

held around the crotch area and swung around while the employees were lip-syncing and

dancing. Ms. Hamon testified LMA had a zero tolerance rule, but did not understand how a skit

such as LMA in a Box violated the policy. Ms. Hamon testified regarding one skit performed at

the National Sales meeting which was based on a SNL sketch:

> Q. Can you explain SNL's skit?
> A. SNL skit has to do with a Christmas present. The actors, there is
>    tow actors and their present is their junk in a box.
> Q. By junk, are you referring to a man's genitalia?
> A. Yes.
> Q. Was the connotation of the LMA in a Box?
> A. If I say yes, I would be guessing.
> Q. From what you remember when you watched it, what did you
>    think that that was referring to in the box, when LMA did the
>    skit?
> A. I imagine they were trying to play off of the skit, so I imagine it
>    was male genitalia in a box, but it was LMA in a Box.
> Q. Do you think that would violate the LMA policy regarding
>    sexual Harassment?

> A. Do I think it – I don't know. I don't find it offensive, but I don't
> know how that works, to be honest.
> Exhibit "G" Depo. Hamon 13:7-14:5 (lines 13:25-14:2
> omitted)

Employee Sonya Campbell watched the LMA in a Box skit and understood that it was sexual in nature. Exhibit "H" Depo. Campbell 24:1-23. "There were sexual innuendos, but it was not overtly sexual in nature in my opinion." Exhibit "H" Depo. Campbell 26:13-15. (See video) LMA's lack of enforcement for its discrimination policy becomes clear from the testimony of Deborah Elliott who did not believe the skits were a "matter to be offended by." Exhibit "I" Depo. Elliott 29:1-3.

> Q. So what would a skit have to have in it to be offensive to you?
> A. Well, I'm not easily offended. At this point, I can't really think
> of any – I guess violence, explicit sexual acts, a complete – I
> don't know, demoralizing of a person, character, those would
> offend me.
> Q. Would making fun of like old people, would that offend you?
> A. No, I am an old person.
> Q. How about making fun of someone with a physical handicap,
> disability?
> A. That might, but it depends on the content.
> Q. What about racial jokes, would that offend you?
> A. Not really. It would depend upon the content.
> Q. What kind of content would offend you about racial jokes?
> A. **Well, I enjoy a good racial joke just like some people. I
> would say if it was very specific to a particular person, per
> se, if it was very demoralizing, then I would object.**
> Exhibit "I" Depo. Elliott 29:18-30:13.

Block also encouraged rule violations with his personal sexual behavior with female employees. Krass described a conversation between himself, Block and Block's rumored girlfriend, Michelle Suarez which occurred in Cabo San Lucas in 2006. Block and Suarez had an open conversation where Suarez discussed shaving Block's pubic region and then letting him do the same to her. Block participated in the conversation and made no attempt to stop it or to correct it as violating

LMA's zero tolerance policy.  Krass was so uncomfortable with the conversation he walked

away. Exhibit "B" Depo. Krass 28:3-5.

> A. I heard Michelle Suarez making inappropriate comments with
>    Steve Block and engaging in a conversation regarding shaving
>    of pubic hairs.
> Q. Okay.  Shaving his, or shaving hers?
> A. Both.
> Q. They were both going to shave each other?
> Q. All right.  When was this?  Was this in Cabo San Lucas,
>    Mexico?  Was this in Atlanta?  Where was it?
> A. This was in Cabo San Lucas.  And I will – I also want to be
>    clear there was laughter and joking at the same time.
> Q. Okay.  Do you think it's appropriate for a supervisor or the CEO
>    of a company to be having those types of conversations with an
>    employee that they have supervisory power over?
> A. It's not appropriate.
>    Exhibit "B" Depo. Krass 30:3-20 (objection omitted)

As the CEO, Block encouraged sexual behavior and outright violations of the LMA harassment

policy. He allowed female underlings to discuss openly around other supervisors the shaving of

his pubic hairs.

> Q. All right Michelle Suarez was telling Steve Block she wanted to
>    shave his pubic hairs?
> A. Her own and his, yes.
> Q. And what was he [Block] doing? Was he touching her?
> A. No.
> Q. Was he just—what was he doing? Just standing there?
> A. **Laughing and encouraging her.**
> **Q. All right. So he was condoning that type of activity?**
> **A. In my opinion yes.**
>    Exhibit "B" Depo. Krass 56:11-23

Based on the actions of Block and COO and then CEO of LMA there is factual testimony to

dispute just what exactly was the policy at LMA for sexual harassment and whether the zero

tolerance to Title VII violations was being followed or upheld. This type of sexual harassment

between employees, from management, and from the CEO was severe and pervasive while

Harrison was employed at LMA.

There was also severe age and gender discrimination. The age and gender discrimination was personified in the fraternal atmosphere created and fostered by Block. "Steve likes a fraternity-type environment." Exhibit "C" Depo. Koning 38:14-15. Block announced in the management meetings "he wanted a younger group of men in a fraternity environment." Exhibit "D" Depo. Harrison 25:21-23.

> A. Steve Block was building a fraternity.
> Q. What do you mean "a fraternity"?
> A. I mean a group of younger guys who you can go out and work
>    with and go out and party with.
>    Exhibit "B" Depo. Krass 51:21-25

Manning testified about the atmosphere at LMA:

> A. You know, at the – one of the sales meetings, when we got to
>    the sales presentation, the final night where the awards were
>    going to be given out, every table had a bottle of tequila on it
>    for the table to share and shoot amongst themselves….and
>    **Steve liked it if the group would get together and go to the
>    bar and run up a tab and kind of make it a fun party
>    atmosphere. And you know, again, that's – it's okay, but
>    it's -  you don't normally see the CEO of a company being
>    the driving force behind those events…**
>    As far as the fraternity thing, I think it's interesting that he
>    likes to bring people from his old company over to LMA.
>    (43:12-18 omitted)
>    But you know, they're kind of his boys, you know. They were
>    there for him when he was at Datascope, and now he's got
>    them on his team at LMA.
> Q. Gordon and Tom testified that if you didn't attend the dinners
>    with Steve Block like he requested, you were punished for it.
>    Did you ever experience that?
> A. I don't remember that I – you know, that I was never punished
>    personally for it, but I think it was every implied that you
>    needed to be at those dinners**. I don't think that Steve had as
>    high of an impression of . . .Claire because [she] didn't
>    really care to go to those dinners or the meetings afterward
>    where there was a lot of drinking and partying going on.**
>    Exhibit "A" Depo. Manning 42:16-44:9

Block was the driving force behind the fraternal atmosphere. Exhibit "A" Depo. Manning 43:1-6.

A. I can state that a general rule, the feeling was that you were
   penalized if you did not attend the dinners.
Q. All right. Who would penalize you?
A. [Block] would.
   Exhibit "B" Depo. Krass 39:15-19

Q. And Steve Block wanted guys that could keep up with his pace.
   Correct?
A. Yes. I mean, well, Steve likes – Steve is a social person, and he
   – I mean, he likes, you know – works hard and plays hard.
   Let's put it that way.
   Exhibit "C" Depo. Koning 39:9-13

Claire Harrison did not fit into this fraternal environment that Block was cultivating. Block

would harass those who did not fit in or chose not to partake in the fraternity.

Q. Okay. Well, you did say you saw him acting out a fraternity
   atmosphere; is that correct?
A. **Right. And you know, the environment that he was trying to
   cultivate, [Claire] really did not fit into.**
Q. **Why would she not fit into the environment that Steve
   Block was trying to cultivate?**
A. **Well, it was a younger party crowd, and Claire was a little
   older and more settled.**
Q. **You're dancing around it. Is your testimony that you saw
   Steve Block creating a fraternity atmosphere? Yes or no.**
A. **Yes.**
Q. Okay. Did this fraternity atmosphere that Steve Block was
   creating include older women?
A. I didn't, but I mean, Claire would have been invited to come if
   she wanted to, but it wasn't the environment that she wanted to
   be around.
Q. **Okay. So your testimony is because she doesn't drink and
   party and stay out all night, she wasn't going to fit well
   with the fraternity environment that was going on?**
A. **Right.**
   Exhibit "A" Depo. Manning 99:20-100:24 (objections omitted)

**The common perception was if you spoke out about something that you thought was**

**inappropriate you would get a negative response.** Exhibit "A" Depo. Manning 40:16-21.

Manning testified it was his impression that "the leadership of the company can circumvent the

policies if need be" so lodging a complaint for harassment or discrimination would be fruitless.

30

Exhibit "A" Depo. Manning 67:16-18. Krass testified that Block "was in a position where he could do pretty much what he wanted." Exhibit "B" Depo. Krass 36:17-18. Harrison attempted to report the issues to her supervisor, but was told nothing could be done.

> A. When I raised my issues with Gordon Krass, and he spoke -- and he told me this. He went to Steve Block, and Steve Block just said, "Tell her to get over it, that I don't like her because she's old. I don't like her because she's a woman." Gordon Krass said, "Why don't you?" His response was, "I don't like her type." And he said, "But, Steve, I'm older, too." And Steve Block's answer was, "But you don't act like it."
> Q. Okay. Did you -- were you present when that conversation occurred?
> A. No.
> Q. Okay.
> A. Gordon relayed that to me, and Gordon said that "I have done what I could do." He also reported to Ron Eck,  and he subsequently followed up with Ron Eck, and he said, "Claire, I've reported this, and no one will do anything, so the best thing for you to do is -- you have a mark on your back -- is to be quiet, do your job, or you will be fired."
> Exhibit "D" Depo. Harrison 288:20-289:16

The fraternal atmosphere fostered by Block at LMA facilitated a hostile work environment in which employees feared retribution if they spoke out. The environment at LMA was hostile. Mark Manning testified, "It's a – in my opinion, it's – and it fits the definition of hostile work environment." Exhibit "A" Depo. Manning 75:12-13. Management and specifically Block was "tough on Claire." Exhibit "A" Depo. Manning 31:5. Block was abusive toward Harrison. "I don't know that his threats were always direct, but they were certainly there in passive aggressive form." Exhibit "A" Depo. Manning 31:9-12. Mark Manning witnessed Claire Harrison visibly upset on two occasions after being assaulted by Block. The first occasion he recalled was in St. Louis, Exhibit "A" Depo. Manning 31:17-32:1 The second incident he recalled was in San Diego at a manager's meeting. Exhibit "A" Depo. Manning 32:3-15.

Manning described LMA under Block's management as a "miserable environment to work in." Exhibit "A" Depo. Manning 30:8-11. Manning testified,

> I don't think we had any training on hostile work environment at LMA, but I think if you were to look at some of the descriptives of hostile work environment, they would parlay well into what the culture was.
> Exhibit "A" Depo. Manning 75:15-19

Plaintiff has presented genuine issues of material fact regarding a hostile work environment. Defendant's Motion for Summary Judgment should be denied.

### F. PLAINTIFF'S CLAIMS OF AGE DISCRIMINATION ARE SUPPORTED BY THE LAW

Plaintiff has established a claim for age discrimination. Plaintiff has shown by a preponderance of the evidence that she is (1) over the age of 40; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) her age was the reason that she was subject to the adverse employment action or that a comparable, non-protected person was selected to replace her. *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993).

1. Plaintiff was Over the Age of Forty

The facts clearly show that the Plaintiff was over the age of 40. Plaintiff was 56 when she was hired at LMA North America.

2. Plaintiff Suffered an Adverse Employment Action

Plaintiff suffered an adverse employment action when she was discharged in October 2007.

3. Plaintiff was Qualified for the Position

Plaintiff was qualified for her position at LMA North America. Plaintiff graduated from Louisiana Tech with a Bachelor of Science in 1972. Exhibit "D" Depo. Harrison 179:19-22. Plaintiff has been working in the medical sales profession since 1981. Exhibit "D" Depo.

Harrison 200:19-20. Gordon Krass testified that Claire Harrison was "an outstanding salesperson and had and excellent track record." Exhibit "B" Depo Krass 64:15-16. Koning also testified that she was qualified for her position, "I felt like Claire had the abilities, had – and definitely had the experience." Exhibit "C" Depo Koning 20:7-9.

    4. <u>Age was the Reason Plaintiff was Subject to Adverse Employment Action</u>

Testimony shows that age was the reason that she was subject to the adverse employment action. The employees that Block was seeking were "a younger sales force of guys or just a younger sales force in general. That was, you know, pretty much a different profile than what Claire would present with." Exhibit "A" Depo. Manning 24:10-16. Mark Manning testified that he personally witnessed the removal of older employees in exchange for younger ones. "It started with Sally Chase, then it was John Loughery, then it was me, and then it was Claire…." Exhibit "A" Depo. Manning 24:10-16.

    5. <u>Plaintiff's Termination for Poor Performance is Pretext</u>

Defendant argues that Plaintiff was fired for poor performance. Poor performance was merely a pretext for her wrongful discharge. Evidence shows that Harrison's discharge was due to the fact she was an older female.

> When I raised my issues with Gordon Krass, and he spoke -- and he told me this. He went to Steve Block, and Steve Block just said, **"Tell her to get over it, that I don't like her because she's old. I don't like her because she's a woman**."
> Exhibit "D" Depo. Harrison 288:20-25
>
> Gordon relayed that to me, and Gordon said that "I have done what I could do." He also reported to Ron Eck, and he subsequently followed up with Ron Eck, and he said, "Claire, I've reported this, and no one will do anything, so the best thing for you to do is -- you have a mark on your back -- is to be quiet, do your job, or you will be fired."
> Exhibit "D" Depo. Harrison 289:9-16

Block fired Harrison because he was "wanting a group of younger people, mostly guys on his sales team" and people like Harrison did not fit into that profile. Exhibit "A" Depo. Manning 55:16-20.

> Q. Did you ever get the impression that the profile he was seeking
>    for was a young white male profile?
> A. Well, yeah. From the one comment he made, you know.
>    Exhibit "C" Depo. Koning 23:14-18
>
> Q. There were references made by Steve that specifically talked
>    about getting younger men into management roles."
>    Exhibit "B" Depo. Krass 11:13-15

Tom Koning heard Block make comments about getting "the young hungry, you know, guy into the territory." Exhibit "C" Depo. Koning 63:10-11. "I knew Claire had a short tenure left with the company. It was only a matter of time." Exhibit "A" Depo. Manning 99:4-5. "The environment that he was trying to cultivate, she really did not fit into." Exhibit "A" Depo. Manning 99:23-25. Block was trying to replace Harrison with a younger male manager. Exhibit "B" Depo. Krass 11:18-24. "He [Block] didn't like her type and [LMA] needed to get you, energetic guys in the management roles." Exhibit "B" Depo. Krass 50:12-14. Harrison was told that Block only wanted "young white men" on his management team. Exhibit "D" Depo. Harrison 61:12-19. Because she was an older female, Block wanted Harrison terminated.

Witnesses testified that if Block no longer wanted an employee working at LMA he would pressure their discharge, by modifying their quotas and ranking them at the bottom. Koning testified if Block did not like you personally it would hurt you would be put at the bottom of the ranking. Exhibit "C" 20:18-21:1. Block's personal likes directly impacted employees. Exhibit "C" 21:24-22:10. "Steve Block had his own evaluation system that – that weren't necessarily tied to performance or results." Exhibit "B" Depo. Krass 38:8-9. Block manipulated the quotas of persons he did not like to get rid of them. Exhibit "D" Depo. Harrison

62:3-12. Example- Krass fired an employee. Krass testified the firing was for "performance, but I was – received significant pressure from Steve Block to do that." Exhibit "B" Depo. Krass 71:21-23. Krass said the firing was from Block pressuring him. 72:10-13. The testimony and evidence supports Plaintiff's claims of age discrimination. There are genuine issues of material fact which a jury must determine.

### G. PLAINTIFF'S CLAIMS UNDER MISS. CODE ANN. § 79-1-9 ARE SUPPORTED BY THE LAW

Mississippi Code Annotated Section 79-1-9 states: "Any corporation doing business in the this state shall be liable…for every unlawful interference with the social, civil, or political rights of any of its agents or employees…." The facts in this case support the claims asserted that LMA violated Plaintiff's social, civil or political rights. LMA fostered a hostile work environment rank with sexual harassment, gender and age discrimination. Plaintiff's rights were interfered with when she was wrongfully discharged and discriminated against due to her age, gender and southern heritage. There are genuine issues of material fact which prohibit summary judgment as a matter of law on Plaintiff's claims under Miss. Code Ann. § 79-1-9.

### IV. CONCLUSION

Plaintiff's evidence shows an actionable claim against LMA or Title VII and ADEA violations

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully request this Court deny the Defendant's Motion for Summary Judgment on the grounds that there exists material issues of fact for the jury to decide regarding the Plaintiff's state and federal claims of harassment, discrimination and hostile work environment.

THIS the 8th day of February, 2011.

35

Respectfully submitted,

CLAIRE HARRISON

BY: /s/ J. Ashley Ogden
       J. ASHLEY OGDEN

OF COUNSEL:

J. ASHLEY OGDEN, ESQ. (MSB #9842)
OGDEN & ASSOCIATES, PLLC
500 East Capitol Street, Suite 3
Jackson, Mississippi 39201
Telephone: (601) 969-0999
Facsimile: (601) 969-0089
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, J. Ashley Ogden, hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

J. Randall Patterson, Esq.
Jennifer G. Hall, Esq.
Baker Donelson Bearman Caldwell
& Berkowitz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211

This the 8th day of February, 2011.

BY: /s/ J. Ashley Ogden
       J. ASHLEY OGDEN